## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| KRISTIE EMERY, as surviving mother of JACOB DANIELS,<br><br>    Plaintiff,<br><br>      v.<br><br>AHMED HOLT,<br>ROBERT TOOLE,<br>DESHAWN JONES,<br>PRESTON CROWDER,<br>MELINDA CARTER,<br>J. KEVIN PERRY,<br>GERAMY BROWN,<br>JARVIS JONES,<br>MICHAEL DUCELUS,<br>GREGORY HOUSE,<br>DELFI SOSA,<br>MICHAEL SMITH,<br>GERARD GORDON,<br>DONOVAN JOHNSON,<br>JANEE WILSON,<br>JENNIFER EDWARDS,<br>COREY ABRAMS,<br>ALTON JAMISON,<br>IRMA WILLIAMS,<br>JOSSHUA SHIELDS, and<br>JORDAN MCDONALD,<br><br>    Defendants. | Civil Action File No.:<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Kristie Emery, as surviving mother and next of kin to Jacob Daniels, brings this civil rights action pursuant to 42 U.S.C. § 1983 arising from her son's violent and preventable death at Phillips State Prison.

1.    Each Defendants' active recklessness led directly to Jacob Daniels being tortured to death over an extended period on August 13, 2022.

2.    Daniels was 18 years old, approximately 123 pounds, and housed in a specialized mental health dorm at Phillips State Prison when he was violently assaulted by two other incarcerated men. During night, when all men were supposed to be locked in their cells, two men entered Daniels' cell and began to assault him. Daniels was tied down, his wrists and feet were broken, he was cut at his wrists and neck, he was stabbed repeatedly, he was stomped, he was strangled, and he was suffocated when mattress filling was stuffed down his throat.

3.    Daniels' death was the inevitable result of gross and unaddressed understaffing, the chronic failure to have functional locks on cell doors, the well documented failure to provide any mental health treatment to the men in the mental health unit, the rampant and persistent failure to conduct required (or any) rounds, the wholesale failure of supervisors to take any action in response to repeated obvious misconduct and dereliction of duty,

and the failure to respond at all after Daniels had been previously violently physically and sexually assaulted.

4.    Daniels' death was not isolated. In 180 days in 2022, at least six men were murdered at Phillips State Prison. Another man was murdered in Daniels' same dorm mere hours after Daniels was killed. Indeed, almost all of the deaths occurred in the same dorm, which housed approximately 50 men. More broadly, the Georgia Department of Corrections has seen an epidemic of deaths by homicide and suicide due to its officials' failures to take any meaningful action in response to dangerous conditions. Georgia's prison system is an extreme outlier compared to its peers nationally.

5.    Each of the Defendants actually knew of the excessive risk of violence at Phillips State Prison and within Daniels' dorm and to Daniels personally. Despite this knowledge, no Defendant took any action.

## JURISDICTION AND VENUE

6.    This is a civil and constitutional rights action arising under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendment to the United

States Constitution. This Court has jurisdiction of federal claims under 28 U.S.C. §§ 1331 and 1343.

7.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims arose in this district and division.

## PARTIES

8.     Plaintiff Kristie Emery is Jacob Daniels' mother and next of kin. She is the anticipated administrator of his estate.

9.     At all times relevant to this complaint, Ahmed Holt was the Assistant Commissioner of the Facilities Division of the GDC. As Assistant Commissioner of Facilities, Defendant Holt was responsible for monitoring the supervision and safety of all people incarcerated in the GDC, including conducting periodic safety assessments, and for exercising final decision-making authority regarding such persons' safety, security, and housing. He was also responsible for adopting and enforcing policies, customs, and practices concerning the housing and safety of all people incarcerated in the GDC. He was further charged with controlling, training, and supervising all GDC personnel responsible for housing and safeguarding people in GDC custody. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Holt acted under color of state law.

10.    At all times relevant to this complaint, Robert Toole was the Director of Field Operations for the GDC. As Director of Field Operations, Defendant Toole was responsible for overseeing the daily operations of every state prison in the GDC, including GSP. He was also responsible for assisting Defendant Holt in monitoring the supervision and safety of all people incarcerated in the GDC, including conducting periodic safety assessments, and in controlling, training, and supervising all GDC personnel responsible for housing and safeguarding people in GDC custody.  He is sued in his individual capacity. At all times relevant to this complaint, Defendant Toole acted under color of state law.

11.    Defendant DeShawn Jones is the Warden of Phillips State Prison and is and was responsible for the day-to-day administration of Phillips State Prison. As Warden, Defendant Jones was responsible for overseeing the security, health, and living conditions of all incarcerated people at Phillips, ensuring appropriate levels of staffing, and supervising all staff. He was also responsible for conducting inspections a minimum of two times per week the mental health dorm where Daniels was housed. At all times relevant to this action, Defendant Jones was acting under color of state law. This suit is brought against Defendant Jones in his individual capacity.

12.    At all times relevant to this complaint, Preston Crowder was a Deputy Warden of Security at Phillips State Prison. He was responsible for security, administration, supervision, and safety at Phillips State Prison. He was responsible for conducting daily inspections in the mental health dorm where Daniels was housed. At all times relevant to this action, Defendant Crowder was acting under color of state law. This suit is brought against Defendant Crowder in his individual capacity.

13.    At all times relevant to this complaint, Melinda Carter was also a Deputy Warden of Security at Phillips State Prison. She was responsible for security, administration, supervision, and safety at Phillips State Prison. She was responsible for conducting daily inspections in the mental health dorm where Daniels was housed. At all times relevant to this action, Defendant Carter was acting under color of state law. This suit is brought against Defendant Carter in her individual capacity.

14.    Defendant J. Kevin Perry was Warden of Phillips State Prison until July 1, 2022. He was responsible for the day-to-day administration of Phillips State Prison. At all times relevant to this action, Defendant Perry was acting under color of state law. This suit is brought against Defendant Perry in his individual capacity.

15.     At all times relevant to this complaint, Geramy Brown was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Brown acted under color of state law.

16.     At all times relevant to this complaint, Jarvis Jones was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Jones acted under color of state law.

17.     At all times relevant to this complaint, Michael Ducelus was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for

monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Ducelus acted under color of state law.

18.    At all times relevant to this complaint, Gregory House was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant House acted under color of state law.

19.    At all times relevant to this complaint, Delfi Sosa was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Sosa acted under color of state law.

20.     At all times relevant to this complaint, Michael Smith was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Smith acted under color of state law.

21.     At all times relevant to this complaint, Gerard Gordon was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Gordon acted under color of state law.

22.     At all times relevant to this complaint, Donovan Johnson was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for

monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Johnson acted under color of state law.

23.     At all times relevant to this complaint, Janee Wilson was a correctional officer at Phillips State Prison. She was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, she was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. She is sued in her individual capacity. At all times relevant to this complaint, Defendant Wilson acted under color of state law.

24.     At all times relevant to this complaint, Jennifer Edwards was a correctional officer at Phillips State Prison. She was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, she was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. She is sued in her individual capacity. At all times relevant to this complaint, Defendant Edwards acted under color of state law.

25.    At all times relevant to this complaint, Corey Abrams was a correctional officer at Phillips State Prison. He was a correctional officer assigned to the mental health unit where Daniels was housed. As the assigned correctional officer to that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Abrams acted under color of state law.

26.    At all times relevant to this complaint, Alton Jamison was a correctional officer at Phillips State Prison. He was the unit manager for the mental health unit where Daniels was housed. As the assigned supervisor that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. Defendant Jamison was responsible for the care, secure confinement, and living conditions of all people incarcerated in the dorm where Daniels was housed. He was also responsible for conducting a daily security inspection of that unit. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Jamison acted under color of state law.

27.    At all times relevant to this complaint, Irma Williams was a correctional officer at Phillips State Prison. She was the Lieutenant for the mental health unit where Daniels was housed. As the assigned supervisor that dormitory, she was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. Defendant Williams was responsible for the care, secure confinement, and living conditions of all people incarcerated in the dorm where Daniels was housed. She was also responsible for conducting a daily security inspection of that unit. She is sued in her individual capacity. At all times relevant to this complaint, Defendant Williams acted under color of state law.

28.    At all times relevant to this complaint, Josshua Shields was a correctional officer at Phillips State Prison. He was the Lieutenant for the mental health unit where Daniels was housed. As the assigned supervisor that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. Defendant Shields was responsible for the care, secure confinement, and living conditions of all people incarcerated in the dorm where Daniels was housed. He was also responsible for conducting a daily security inspection of that unit. He is sued in his individual capacity.

At all times relevant to this complaint, Defendant Shields acted under color of state law.

29.    At all times relevant to this complaint, Jordan McDonald was a correctional officer at Phillips State Prison. He was the Lieutenant for the mental health unit where Daniels was housed. As the assigned supervisor that dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting 15- or 30-minute checks in the dormitory. Defendant McDonald was responsible for the care, secure confinement, and living conditions of all people incarcerated in the dorm where Daniels was housed. He was also responsible for conducting a daily security inspection of that unit. He is sued in his individual capacity. At all times relevant to this complaint, Defendant McDonald acted under color of state law.

**FACTS**

*Staffing*

30.    To ensure the safety and wellbeing of people in the mental health dorm, GDC policy required correctional officers to conduct "checks" on each person housed in the D dormitory where Jacob Daniels was housed at least once every 15 and 30 minutes in order to observe and evaluate conditions of confinement and speak with people.  By policy, certain prison administrators

were also required to conduct frequent inspections of the units.  For example, the Warden was required to inspect the unit at least twice per week; the Deputy Wardens and Unit Managers were required to conduct daily inspections; and the shift supervisors were required to conduct inspections once per shift.

31.    The checks and inspections referenced here, and in all subsequent paragraphs, required the inspector(s) to go cell-to-cell to speak with the people confined there.

32.    The reality of life in the mental health dorm, however, bore no resemblance to the policy.  At all times relevant to this complaint, Phillips State Prison was chronically understaffed and had one of the highest officer vacancy rates among Georgia prisons, at approximately 65 percent.  Put another way, Phillips State Prison employed about a third of the personnel required to run the prison in a minimally safe way.

33.    Staffing choices at the prison level, started by Defendants Perry, Carter, and Crowder, and inexplicably continued under DeShawn Jones, made the staffing situation in the D dormitory worse.

34.    At night, when the men were supposed to be locked inside their cells, at least three line level correctional officers were required to be assigned to the D dormitory.

35.    During the day, additional correctional officers were required because there was additional movement mandated, including for showers, mental health treatment, and out of cell time.

36.    At all times, two or more supervisors were required to assist with running the D dormitory.

37.    Throughout July and August 2022, at no time were even two, much less the required three, line level correctional officers assigned to D dormitory.

38.    Often times, only one officer was assigned to cover D dormitory *in addition* to another post outside of the D building.

39.    Cadets, who are not certified, and were not permitted to supervise incarcerated men, were given blanket responsibilities at Phillips State Prison.

40.    Cadets were instructed to carry keys, although they were not permitted to do so.

41.    Cadets were told to respond to brawls with weapons, although they were not permitted, or trained, to do so.

42.    The supervisors, to include Defendants Brown, Abrams, Jamison Williams, Shields, and McDonald did not assist the line level officers with conducting required rounds.

43.     Prison administration, including Perry, Carter, Crowder, and DeShawn Jones, did not assist the line level officers or require the supervisors to do the required work.

44.     Defendants Holt, Toole, DeShawn Jones, Crowder, Carter, and Perry all shared responsibility for adequately staffing Phillips State Prison.

45.     Defendants Holt and Toole participated in monthly meetings that showed that Phillips was one of the most understaffed facilities in the state.

46.     Defendants DeShawn Jones, Crowder, Carter, and Perry were acutely aware of the understaffing issues at Phillips.

47.     Each of the Defendants knew of the dangers of an understaffed prison.

48.     Each of the Defendants knew that an understaffed mental health unit posed greater dangers to incarcerated men and staff.

49.     In the two months prior to Daniels' death, there were at least two murders attributable to understaffing and inadequate supervision of incarcerated men with mental health diagnoses at Phillips State Prison.

50.     None of the Defendants took any efforts—much less reasonable efforts—to address staffing.

51.     In 2022, the Georgia Department of Corrections and Phillips State Prison paid its officers significantly less than other states' prison

systems. If Georgia was not the very lowest, it was among the absolute

lowest. Alabama, Tennessee, South Carolina, and Mississippi, as examples,

paid significantly more.

52.     In 2022, the Georgia Department of Corrections and Phillips

State Prison had significant money available and allocated to pay

correctional officers, but they failed to spend that money.

53.     Because of its location within metropolitan Atlanta, Phillips

State Prison should have been easier to staff than facilities in more rural

areas of the state with a smaller pool of potential employees.

54.     Instead, Phillips was one of the worst staffed facilities in the

country.

### *Locks*

55.     Cell door locks at Phillips State Prison have not worked for many

years prior to Daniels' death in August 2022.

56.     The door locks are poorly designed so that they are easy to open

from the inside and the outside when they are intended to be locked.

57.     The locks are also easy to damage, making them even easier to

open.

58.    Massive numbers of assaults and many murders, sexual assaults, and the proliferation of contraband occurred as a result of defective door locks.

59.    The door locks in D Dormitory were especially faulty.

60.    Every Defendant knew about the door locks not working.

61.    Not one Defendant did anything to fix the doors.

62.    In multiple lawsuits, incarcerated individuals have complained about pervasive problems with non-functional door locks at Phillips.

63.    The problems with door locks at Phillips has persisted through Perry and DeShawn Jones' tenures as Warden.

64.    By way of example, in *Jane Doe v. Georgia Department of Corrections,* Case No. 1:23-cv-5578-MLB, the Plaintiff detailed how she, as a transgender individual, was housed in a cell at Phillips without a functioning lock from April 2022 to October 2023. This period includes two different cells that Plaintiff was housed in during that time, neither of which had a functioning door lock.

65.    In this same Complaint, Plaintiff details how she repeatedly brought this security flaw to the attention of Defendant DeShawn Jones.

66.    DeShawn Jones admitted that he knew about the faulty door locks even before Doe raised her concerns.

67.     Similarly, that Plaintiff described how she was attacked numerous times because of the failures of door locks in her cell. Ultimately, and belatedly, officials—at the direction of DeShawn Jones—opted to put a padlock around Plaintiff's cell in mid-October 2023 rather than move Plaintiff into a cell with a functioning lock or repair the cell doors.

68.     Similar allegations of faulty locks within Phillips were made in *Lenz v. Jones, et al.,* Case No. 1:24-CV-1510 (N.D. Ga.). Mr. Lenz's Complaint details a culture of carelessness about the lack of functioning locks within Phillips.

69.     Mr. Lenz's Complaint claims that in May 2023, an inmate bypassed the lock to his cell and assaulted him with two weapons, leading to lacerations on his head.

70.     Mr. Lenz's Complaint also claims that Prison officials had known that locks within Phillips did not function properly and cell doors "in every building" could be manipulated and easily bypassed.

71.     Mr. Lenz's Complaint describes how Prison officials regularly ask inmates to assist with opening cell doors of other inmates because the locks are no longer functioning and under control of Prison staff.

72.     Mr. Lenz's Complaint depicts a state of affairs at Phillips where inmates can easily exit their cells and just as easily gain access to other inmate's cells.

73.     Mr. Lenz's Complaint details how Prison officials had known about the faulty locking system at Phillips "several years" before his May 2023 injury, yet they failed to take any action to correct this problem.

74.     Similar allegations of faulty locks were made in *Williams v. State of Georgia*, Case No. 23-A-06196-8 (Sup. Ct. Gwinnett) (2023).

75.     According to Williams, the majority of the locks in the J-Building at Phillips had been non-functional for several years and Prison officials were aware of these security failures.

76.     Williams claims that he raised these security concerns in multiple grievances to the prison administrators.

77.     Moreover, Williams describes how Prison staff (including Defendant Brown) orchestrated fights between rival gang members often by bringing gang members to an area where a potential victim was in a room or cell with a non-functioning lock.

78.     Williams describes how after he was assaulted in July 2022, he filed internal grievances alerting officials about security failures and flaws within Phillips.

79.    Specifically, Williams claims that Defendant Brown threatened him in response to his filing these grievances.

80.    Prison officials, to include Defendant Brown, have publicly admitted that faulty locks within Phillips allowed incarcerated men in his unit to freely enter and exit their cells.

81.    Defendant Brown explained that Phillips State Prison's administration and supervisors, to include Defendants DeShawn Jones, Crowder, Carter, Jamison, and Williams, reviewed video of D Dormitory and observed men having the ability to go wherever they wanted whenever they wanted.

82.    There is an additional problem with the door locks in the D Dormitory at Phillips State Prison.

83.    In addition to the faulty locks that should be opened and closed from the control room (but in reality can be opened from the inside or outside by incarcerated men), there are sliding bolt locks on the outside of the doors that correctional officers are supposed to use when the men are locked down, such as at night.

84.    When the slide bolt locks are used, it is somewhat harder for the incarcerated men to escape their cells. It still happens, but it takes more time, and it can be addressed as it happens with proper rounds.

85.    But the practice of the correctional officers in the D Dormitory in summer of 2022 was to not use the slide bolt locks.

86.    There was no reason not to use the slide bolt locks except if a correctional officer was willfully refusing to do their work and did not want to make the effort to close each door manually instead of flipping a switch to "lock" the doors from the control room.

87.    The net result of the problems with the door locks was that incarcerated people in the D Dormitory could escape their cells, and enter others' cells, at their will, leading to rampant violence.

88.    Each Defendant was aware of the condition of the door locks and the practices about locked doors.

89.    No Defendant did anything to change it.

### Rounds

90.    The limited staff employed by the Prison regularly and grossly failed to perform the regular inspections as well as the 15- and 30-minute checks required by prison policy.  And when they did, the checks were often merely cursory.  In fact, it was a widespread practice at the time for officers to walk by people's cells without speaking to them, without asking if they were okay, and without otherwise slowing down to observe them or ensure they were responsive.  Other times, officers were so overwhelmed that they

would observe serious medical needs and do nothing at all in response. Still other times staff abandoned their posts entirely for no reason.

91.    Line level officers, supervisors, and prison administration were all required to document their checks in the logbook.

92.    The supervisors and prison administrators were required to review the logbook to see whether the required checks were being done.

93.    The logbook shows that no one was doing the required checks.

94.    Audits that Defendants Holt, Toole, DeShawn Jones, Crowder, Carter, and Perry reviewed flagged that 30-minute checks were not being done.

95.    In response, these Defendants took no action.

96.    Even a cursory review of the logbook in D Dormitory in the weeks preceding and following Daniels' death revealed there was no supervision of the incarcerated men.

97.    There are entire days where are there are no entries whatsoever in the logbook.

98.    There is only one entry where Defendant DeShawn Jones made his required twice a week inspection in the month surrounding Daniels' death.

99.    On that day, Defendant DeShawn Jones, along with Crowder and Carter, observed that there were no logbook entries whatsoever for the two preceding days—or at least four full shifts.

100.    This means that there had been no rounds whatsoever for 48 hours or more.

101.    DeShawn Jones, Carter, and Crowder took no corrective action despite these egregious lapses.

102.    Similarly, other supervisors, including Brown, Abrams, Jamison, Williams, Shields, and McDonald, failed to take any corrective action despite the obviousness of the fact that their supervisees were wholly derelict in their duties.

103.    Instead, for the next two and a half days—another five full shifts—no rounds were made and only a single entry was made in the logbook.

104.    Over 62 hours elapsed without a single round being conducted.

105.    Count must be done five times a day and documented in the logbook.

106.    No one conducted count for 12 times in a row, and no one took any action in response.

107.    It was uncommon for the required 30-minute checks to be done.

108.   Often very long periods would go by, including entire shifts, without any rounds being conducted.

109.   When rounds were conducted, very dangerous conditions were noted as the norm.

110.   For example, on August 5, 2022, days before Daniels was killed, the logbook noted two separate incidents with knives, including one involving an incarcerated man in the D Dormitory that was supposed to be in the F Dormitory. In another, separate, incident that day, the logbook noted a suicide attempt.

111.   By way of further example, on August 15, 2022, days after Daniels and another man were killed in D Dormitory, the logbook noted a violent assault, a contraband razor, and two separate fires.

112.   Other very dangerous conditions were not noted at all because no rounds were being done.

113.   By way of example, the death of James Smith, hours after Daniels' death, was entirely omitted from the logbook.

114.   The logbook also reveals that entries were made out of chronological order which is an obvious sign of falsification.

115.   Each of the line level officers, to include Brown, Jarvis Jones, Ducelus, House, Sosa, Smith, Gordon, Johnson, Wilson, Edwards, and Abrams, were directly responsible for these failures.

116.   Each of the prison administrators and supervisors, to include DeShawn Jones, Crowder, Carter, Perry, Brown, Abrams, Jamison, Williams, Shields, and McDonald knew about these systemic failures and did nothing.

117.   Defendants Holt and Toole received repeated notice via audits and other reports about the repeated failure to do any rounds, 30-minute checks, or to conduct regular counts, as required. They did nothing in response.

118.   This dangerous practice of failing to conduct any rounds had fatal consequences.  In approximately three months in the summer of 2022, at least five men were murdered in Phillips State Prison, almost all of them with connection to the D Dormitory.

119.   Many other men in D Dormitory experienced serious crises, including stabbings, self-harm, drug use, seizures and loss of consciousness, that went unattended for prolonged periods of time.  In many instances, no officers were present or reachable during these emergencies.

### *Mental Health Treatment*

120.   Phillips State Prison did not provide basic mental health care to people in the D Dormitory in 2022.

121.   A routine audit noted flagrant departures from requirements.

122.   For example, there were no group case conferences, which are required weekly meetings involving treatment teams and officers and supervisors concerning incarcerated people with mental health diagnoses.

123.   The mental health unit managers, to include Jamison, Williams, Shields, and McDonald were required to log all significant incidents, but they failed to log any such incidents.

124.   There were no required mental health group meetings.

125.   Mental health treatment plans were ignored.

126.   Mental health counselling was not conducted as required.

127.   Incarcerated men who were required to be seen out of their cell weekly were not seen at all.

128.   There were no community meetings for incarcerated men with mental health diagnoses in supportive living units.

129.   Each of these requirements was ignored wholesale.

130.   Defendants DeShawn Jones, Crowder, Carter, Perry, Brown, Jarvis Jones, Ducelus, House, Sosa, Smith, Gordon, Johnson, Wilson,

Edwards, Abrams, Jamison, Williams, Shields, and McDonald knew that there was no provision of mental health services to the men housed in D Dormitory.

131.   These Defendants knew that the men in D Dormitory had the most acute mental health needs and they were being ignored entirely.

132.   These Defendants did nothing to address the lack of mental health care.

### Classification and Past Attacks

133.   D Dormitory was for Level IV designated incarcerated individuals, which is the highest level of mental health acuity.

134.   Phillips is one of two GDC facilities that houses Level IV inmates.

135.   Each of the Defendants was aware of the risks that some Level IV inmates posed and, despite this risk, failed to ensure that D Dormitory contained adequate security features to prevent violence.

136.   Although Daniels suffered from significant mental health challenges, he did not pose a threat to other incarcerated men.

137.   He should not have been housed in any area with men who posed the highest possible security risk with inadequate staffing, supervision, locks, and mental health care.

138.    Each of DeShawn Jones, Crowder, Carter, Perry, Brown, Jarvis Jones, Ducelus, House, Sosa, Smith, Gordon, Johnson, Wilson, Edwards, Abrams, Jamison, Williams, Shields, and McDonald actually knew that Daniels was especially vulnerable and that he had been attacked repeatedly at Phillips during the short time he was there.

139.    These Defendants knew that Daniels was not properly classified and should not have been in the D Dormitory with the conditions present.

140.    These Defendants knew that Daniels had been raped on multiple occasions and beaten on multiple occasions.

141.    These Defendants knew that Daniels was openly gay and gender nonconforming and that this caused problems between Daniels and Defendants as well as Daniels and some of the incarcerated men.

142.    These Defendants knew that Daniels had significant mental health issues, to include bipolar and significant learning disabilities, and that he had previously been found incompetent to stand trial.

143.    These Defendants knew that Daniels was very young and skinny and could not defend himself.

144.    Despite their knowledge of Daniels' unique vulnerabilities, and past attacks, these Defendants did nothing to protect Daniels.

145.   These Defendants did nothing to ensure that Daniels was placed in a safe, constitutionally adequate housing assignment.

### *Supervision*

146.   Brown was a Sergeant, who also worked as a line level officer. Brown had previously been a Lieutenant, but he had been demoted for serious misconduct.

147.   Abrams was also a Sergeant, who also worked as a line level officer.

148.   Brown, Abrams, Jamison, Williams, Shields, and McDonald were directly responsible for supervising Jarvis Jones, Ducelus, House, Sosa, Smith, Gordon, Johnson, Wilson, and Edwards.

149.   Brown, Abrams, Jamison, Williams, Shields, and McDonald knew that their supervisees were not conducting rounds, were not doing counts, were not locking doors, were permitting men to roam freely when they were required to be locked in cells, and were not cooperating with or facilitating mental health care.

150.   In response, they did nothing, even as violence increased dramatically.

151.   DeShawn Jones, Crowder, Carter, and Perry were responsible for supervising the other Defendants at Phillips.

152.   These Defendants also knew that staff in the D Dormitory was not conducting rounds, were not doing counts, were not locking doors, were permitting men to roam freely when they were required to be locked in cells, and were not cooperating with or facilitating mental health care.

153.   In response, they did nothing, even as violence increased dramatically.

### *Daniels' Torture and Murder*

154.   After the 11:00pm lockdown in D Dormitory on August 12, 2022, two men were able to escape from their cells due to the lack of any supervision and the chronically defective locks.

155.   In the early morning of August 13, 2022, these two men were able to force their way into Daniels' locked cell.

156.   The assailants then entered Daniels' cell and restrained him.

157.   The assailants broke the bones in Daniels' wrists and feet.

158.   The assailants slashed Daniels' wrist and throat with broken glass.

159.   The assailants stabbed Daniels' throat with an ink pen.

160.   The assailants stuffed Daniels' nose and mouth with mattress filling material.

161.   The assailants caused Daniels immense pain and suffering in the time before his death.

162.   The assailants attacked Daniels for hours before he died.

163.   No correctional staff responded to the attack until the assailants sought out and found a correctional officer, who they then told that they had killed Daniels.

164.   Hours later, after further abandonment of the D Dormitory, another man was killed or killed himself due to the same reckless and total dereliction of responsibility.

### *Defendants' Knowledge of Daniel's Torture as it Happened*

165.   The Georgia Department of Corrections has apparently spoliated evidence, including post orders, showing who was working where at Phillips State Prison on the dates in question.

166.   In other places, similar records, including the logbook have been falsified.

167.   Other records have not been provided despite requests.

168.   Every person in D Dormitory could hear the attack in progress over hours.

169.   Defendant Brown was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

170.   In the alternative, Brown knew the attack was happening but did nothing to intervene, including by calling for help.

171.   In the alternative, Brown set up the assault, as he did in the murder of Quafabian McBride and in a series of prior assaults.

172.   Defendant Jarvis Jones was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

173.   In the alternative, Jarvis Jones knew the attack was happening but did nothing to intervene, including by calling for help.

174.   In the alternative, Jarvis Jones set up the assault, as he did in the murder of Quafabian McBride.

175.   Defendant House was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

176.   In the alternative, House knew the attack was happening but did nothing to intervene, including by calling for help.

177.   Defendant Ducelus was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

178.   In the alternative, Ducelus knew the attack was happening but did nothing to intervene, including by calling for help.

179.   Defendant Sosa was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

180.   In the alternative, Sosa knew the attack was happening but did nothing to intervene, including by calling for help.

181.   Defendant Smith was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

182.   In the alternative, Smith knew the attack was happening but did nothing to intervene, including by calling for help.

183.   Defendant Gordon was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

184.   In the alternative, Gordon knew the attack was happening but did nothing to intervene, including by calling for help.

185.   Defendant Johnson was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

186.   In the alternative, Johnson knew the attack was happening but did nothing to intervene, including by calling for help.

187.   Defendant Wilson was assigned to D Dormitory for the shift when Daniels was killed, but she inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

188.   In the alternative, Wilson knew the attack was happening but did nothing to intervene, including by calling for help.

189.   Defendant Edwards was assigned to D Dormitory for the shift when Daniels was killed, but she inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

190.   In the alternative, Edwards knew the attack was happening but did nothing to intervene, including by calling for help.

191.   Defendant Abrams was assigned to D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

192.   In the alternative, Abrams knew the attack was happening but did nothing to intervene, including by calling for help.

193.  Defendant Jamison was assigned to supervise D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

194.  In the alternative, Jamison knew the attack was happening but did nothing to intervene, including by calling for help.

195.  Defendant Williams was assigned to supervise D Dormitory for the shift when Daniels was killed, but she inexplicably and without reason wholly abandoned her post despite observing the assailants outside of their cells.

196.  In the alternative, Williams knew the attack was happening but did nothing to intervene, including by calling for help.

197.  Defendant Shields was assigned to supervise D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason wholly abandoned his post despite observing the assailants outside of their cells.

198.  In the alternative, Shields knew the attack was happening but did nothing to intervene, including by calling for help.

199. Defendant McDonald was assigned to supervise D Dormitory for the shift when Daniels was killed, but he inexplicably and without reason

wholly abandoned his post despite observing the assailants outside of their cells.

200.   In the alternative, McDonald knew the attack was happening but did nothing to intervene, including by calling for help.

<u>COUNT I</u>
*Deliberate Indifference*
*42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments*

201.   Daniels' torture and murder was an objectively serious deprivation.

202.   Each of the Defendants actually knew of the high risk, and high rate, of deadly violence within the D Dormitory at Phillips State Prison in 2022 before Daniels' murder. Each of the Defendants knew that the prison was egregiously understaffed, that it lacked functional locks, that rounds and 30-minute checks were being flagrantly disregarded, and that no mental health treatment was being provided as required.

203.   Each of DeShawn Jones, Crowder, Carter, Perry, Brown, Jarvis Jones, Ducelus, House, Sosa, Smith, Gordon, Johnson, Wilson, Edwards, Abrams, Jamison, Williams, Shields, and McDonald knew that there was no supervision of incarcerated men or of prison staff at the facility and that Daniels was grossly misclassified and that he had been previously attacked.

204.    Each of Brown, Jarvis Jones, Ducelus, House, Sosa, Smith, Gordon, Johnson, Wilson, Edwards, Abrams, Jamison, Williams, Shields, and McDonald knew of the attack as it was happening or they failed to realize the attack was happening because they abandoned their post, even after observing the assailants outside of their cells.

205.    None of the Defendants did anything to address any of these obvious and immediate security threats.

206.    Each of the Defendants could have taken efficacious action, but instead they acted with recklessness.

207.    As a direct result of each Defendants' recklessness, Jacob Daniels died an unfathomably horrific death.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests this Court:

    a) Hold a trial by jury on all issues so triable;

    b) Award nominal, compensatory, special, and punitive damages to Plaintiff against Defendants in an amount to be proven at trial;

    c) Award Plaintiff attorney fees under 42 U.S.C. § 1988;

    d) Tax all costs of this action against Defendants;

    e) Award any additional or alternative legal or equitable relief that is just and appropriate.

Respectfully submitted, this 6th day of August, 2024.

/s/ *Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
Samantha Funt
Georgia Bar No. 943783

MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, Georgia 30305
Phone: 404-812-4747
Fax: 404-812-4740
zack@mitchellshapiro.com
sam@mitchellshapiro.com